UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

CLAL FINANCE BATUCHA INVESTMENT   :
MANAGEMENT, LTD., THE PHOENIX
INSURANCE COMPANY, LTD.,              :
EXCELLENCE NESSUAH MUTUAL
FUNDS MANAGEMENT, LTD., and        :
EXCELLENCE NESSUAH GEMEL &
PENSION, LTD., Individually and On   :
Behalf of All Others Similarly Situated,

                :

          Plaintiffs,      :

    - against -       :

PERRIGO COMPANY, JOSEPH C. PAPA,  :
JUDY L. BROWN, LAURIE BRLAS,
GARY K. KUNKLE, JR. and BEN-ZION :
ZILBERFARB,

          Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

09 Civ. 2255 (TPG)

**AMENDED OPINION**

This is a securities class action complaint on behalf of all persons who purchased or otherwise acquired the common stock of Perrigo Company ("Perrigo") from November 6, 2008 through February 2, 2009 ("Class Period") against Perrigo and certain of its officers and directors for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

Defendants now move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint in its entirety for failure to state a claim.

The 12(b)(6) motion should be granted in part and denied in part.

**The Complaint**

The following facts are alleged in the Amended Complaint and, for the purposes of this motion, are assumed to be true.

The Parties

Perrigo is a leading global healthcare supplier that develops, manufactures, and distributes over-the-counter and generic prescription pharmaceuticals, nutritional products, and active pharmaceutical ingredients. Defendant Joseph C. Papa is Perrigo's President, Chief Executive Officer and Chairman of the Board, and defendant Judy L. Brown is Perrigo's Executive Vice President and Chief Financial Officer.   Defendants Laurie Brlas, Gary K. Kunkle, Jr., and Ben-Zion Zilberfarb are members of Perrigo's Board and Audit Committee.

The Facts

A. Auction Rate Securities

Auction Rate Securities ("ARS") are long-term securities, such as corporate or municipal bonds with 30-year maturities, which have been effectively turned into short-term instruments because the interest rates on the bonds could be reset on occasion through Dutch auctions held every 7, 14, 28, or 35 days.

At the auctions, purchasers pay par value for the securities, but bid against one another for the interest rate they are willing to accept.   If there are enough bids to purchase all the ARS for sale at an auction, the interest rate is set for all ARS which are purchased at the lowest rate among all the bids.   If there are not enough bidders to purchase all the ARS, the auction fails and ARS holders wishing to liquidate the instruments must wait until the next auction. The liquidity of the ARS is therefore directly tied to the success of the auctions.

The issuers of ARS selected one or more broker-dealers to underwrite the offering and manage the subsequent auctions.   Lehman Brothers Inc. was one such broker-dealer.   Indeed, Lehman was a major player in the ARS market, underwriting ARS and remarketing the securities at auctions.   Lehman also provided valuations of the ARS to its customers.   Perrigo invested in ARS and bought them from Lehman.

The attractiveness of ARS began to wane after mid-2007, when the credit crisis deepened.   Investors began to stay away from ARS auctions.   Initially, there were relatively few auction failures because the investment banks, which had underwritten the ARS and managed the auctions, supported the auctions by making purchases for themselves.   However, by mid-February 2008, the investment banks to a large extent stopped supporting the auctions, resulting in wholesale auction failures.   Plaintiffs allege that Lehman started the chain reaction when, on or about January 23, 2008, Lehman chose not to place a support bid in an ARS auction, causing that auction to fail.   With almost no secondary market and virtually no liquidity, the value of ARS plummeted.

B. Perrigo's Pre-Class Period Disclosures About Its ARS Portfolio

Perrigo made its first disclosure of its ARS holdings in its May 6, 2008 Form 10-Q filing for the third quarter of fiscal 2008, ending March 29, 2008 ("3Q08").   Perrigo stated, in relevant part:

> The Company maintains a portfolio of auction rate securities totaling approximately $18,000,000 in par value.  . . .  Auction rate securities have recently

failed to settle at auction resulting in an illiquid market for these types of securities. Although the Company continues to earn interest on these investments at the maximum contractual rate, the estimated fair value of auction rate securities can no longer be determined by the auction process until liquidity is restored to these markets.

At March 29, 2008, the Company continued to record these securities as available-for-sale, at a fair value of approximately $14,600,000, based on estimates provided by the firm managing these investments, and recorded an unrealized loss of approximately $3,400,000 in other comprehensive income. The Company also reclassified the securities from current assets to other non-current assets due to the unpredictable nature of the illiquidity of the market for the securities.

As of March 29, 2008, the Company concluded that no other-than-temporary impairment loss has occurred. The Company has the ability and intent to hold these securities for a period of time sufficient to allow for a recovery of market value. In addition, the companies underwriting these securities continue to maintain their AAA counter party credit rating and pay the maximum interest contractually required.  . . .

This document was signed by defendants Papa and Brown.

In its 10-K for the fiscal year ending June 28, 2008, filed with the SEC on August 18, 2008, Perrigo made identical statements about the ARS, except for lowering the fair value by another $100,000 (to $14.4 million from $14.5 million) and deleting any reference to any specific credit rating of the issuers.   This document was signed by all defendants.

At the time, ARS holders apparently assumed that underwriters or sellers of ARS would eventually redeem the securities because of the following circumstances.   The Attorneys General for the State of New York and

Commonwealth of Massachusetts, as well as the SEC and various U.S. Attorneys, had initiated investigations and/or proceedings against numerous ARS underwriters.   These law enforcement entities alleged, *inter alia,* that the banks had misled investors about the liquidity of ARS, often calling them equivalent to money markets or cash.   As a result, many brokerage houses began to redeem ARS from retail clients.   For example, on August 7, 2008, Citigroup and Merrill Lynch agreed to buy back ARS from certain clients.   On August 9, 2008, UBS Securities LLC and UBS Financial Services did the same.

C. The Adverse Impact of the Lehman Bankruptcy on ARS Underwritten, Sold, Managed or Valued by Lehman

Any hope by defendants that such redemptions would extend to Perrigo's ARS holdings disappeared with the September 15, 2008 bankruptcy filing by Lehman Brothers Holdings in the Southern District of New York (the "Bankruptcy"), and the September 19, 2008 order by the bankruptcy court for Lehman's liquidation.   Lehman had sold the ARS to Perrigo.

There followed highly publicized and widespread reports about the adverse impact that the Bankruptcy was having on ARS and other derivatives underwritten, sold, managed, or valued by Lehman.

As will be described in detail, Perrigo failed for a time to write down the value of the securities.   Instead, Perrigo continued to use the same fair value estimate (80% of face value) it had first used for the quarter ending March 29, 2008.   Defendants also remained silent about the Lehman connection.

In contrast, many other public companies disclosed their Lehman connections and reduced fair value estimates and/or recognized permanent impairment charges against income.

For example, on November 4, 2008, in reporting results for the quarter ending September 30, 2008, Northgate Minerals Corp. announced a $16.9 million permanent charge on Lehman-related ARS, or 59.5% of pre-tax losses, after having already reduced the fair value of these securities by $2.4 million in the prior quarter, and by $5.0 million in the quarter ending March 29, 2008.   In its quarterly report ending September 30, 2009, Northgate stated that an "other than temporary impairment" designation of ARS was based on "a variety of factors, including the bankruptcy of Lehman Holdings and its affiliates, the very substantial decline in the estimated fair value of individual investments for an extended period of time, recent downgrades in credit ratings for many issuers and adverse market conditions, particularly in the credit markets, which negatively impacted individual securities."

Another company, Electro Scientific Industries, Inc., took a $5.4 million permanent charge on their ARS securities, or 81.8% of reported pre-tax losses, in reporting results for the quarter ending September 27, 2008, after having already taken a $5.1 million permanent impairment charge in the immediately previous quarter or 113.3% of pretax losses, and a $3.9 million temporary charge in the quarter ending March 29, 2008.   Electro Scientific Industries simultaneously disclosed that Lehman had been the broker who had been providing investment

management, custodial and valuation services for these securities prior to bankruptcy.

And, on November 14, 2008, CallWave, Inc., in reporting its results for the quarter ending September 30, 2008 in a Form 10-Q, took a temporary impairment charge of $3.2 million or 42.7% of the initial value of their ARS holdings explaining that Lehman had held the company's ARS investments, and that after the declaration of bankruptcy, the company had lost hope that Lehman would reach an agreement with regulators to redeem those ARS.

D. Defendants' Statements

On November 6, 2008, Perrigo issued a press release announcing its results for the fiscal 2009 first quarter ending on September 27, 2008 ("1Q09"), which stated in relevant part:

> Net sales for the first quarter of fiscal 2009 were $480.2 million, an increase of 25 percent. Reported net income was $37.9 million, or $0.40 per share, compared with $34.0 million, or $0.36 per share, a year ago, an increase of 12 percent. Excluding a loss on the exchange of property of the Company's UK vitamin business, first quarter fiscal 2009 adjusted net income was $38.6 million, or $0.41 per share.
> . . . .
> Perrigo Chairman and CEO Joseph C. Papa stated, "Fiscal 2009 is off to the strong start we had anticipated. In the first quarter, we achieved both record sales and record earnings . . . .

On November 6, 2008, Perrigo filed a Form 8-K with the SEC, attaching a copy of the above press release as an exhibit.   Defendant Brown signed the Form

8-K as Executive Vice President, Chief Financial Officer, and the Principal

Accounting and Financial Officer.

Also on November 6, 2008, Perrigo filed a Form 10-Q with the SEC setting

forth Perrigo's financial results for 1Q09, which were essentially the same as

those contained in Perrigo's press release issued the same date.

In this 10-Q, Perrigo used almost the same language concerning its ARS

portfolio as it had used in the pre-Class Period statements detailed above.   It

was still using a fair value estimate of about 80% of face value provided by an

unnamed manager.   The 10-Q stated in relevant part:

> [T]he estimated fair value of auction rate
> securities can no longer be determined by the auction
> process until liquidity is restored to these markets.
> At September 27, 2008, the Company continued
> to record these securities as available-for-sale, at a fair
> value of approximately $14,500[,000], based on, among
> other things, estimates provided by the firm managing
> these investments, and recorded an unrealized loss of
> approximately $2,550[,000], net of tax, in other
> comprehensive income (loss) in fiscal 2008. Beginning
> in the third quarter of fiscal 2008, the Company
> reclassified the securities from current assets to other
> non-current assets due to the unpredictable nature and
> the illiquidity of the market for the securities.
> As of September 27, 2008, the Company
> concluded that no other-than-temporary impairment
> loss has occurred.

The Form 10-Q was accompanied by certifications signed by defendants

Papa and Brown, affirming that, to their knowledge, the quarterly report did not

contain any misleading statements, and that the "financial statements, and

other financial information included in this report, fairly present in all material

respects the financial condition, results of operations and cash flows of the

registrant as of, and for, the periods presented in this report."   They also

affirmed that they had abided by their responsibilities "for establishing and

maintaining disclosure controls and procedures . . . and internal control over

financial reporting" and had evaluated their effectiveness.

On February 3, 2009, before the market opened, Perrigo issued a press

release about its results for the fiscal 2009 second quarter ending December 27,

2008, which reflected a significant decline in earnings due to charges related to

the ARS.   Perrigo also revealed the Lehman connection.   The press release

stated in relevant part:

> Reported net income was $25.0 million, or $0.27
> per share, compared with $34.3 million, or $0.36 per
> share, a year ago, a decrease of 27%. Excluding charges
> as outlined in Table II at the end of this release, second
> quarter fiscal 2009 adjusted net income was $42.7
> million, or $0.46 per share.
> The Company incurred a charge of $15.1 million,
> or $0.16 per share, related to the write-down of auction
> rate securities purchased in Israel from Lehman
> Brothers. These assets were written down from a face
> value of $18.0 million and continue to be held in
> non-current assets.

Also on February 3, 2009, Perrigo filed a Form 10-Q with the SEC setting

forth Perrigo's financial results for the fiscal 2009 second quarter, which stated

in relevant part:

> The Company's investment securities include
> auction rate securities totaling $18,000[,000] in par
> value. . . .

> During the third quarter of fiscal 2008, the
> Company recorded an unrealized loss of $3,453[,000],
> net of tax, in other comprehensive income (loss). The
> amount of the write-down was based on, among other
> things, estimates provided by Lehman Brothers, the
> firm managing these investments, which subsequently
> filed for bankruptcy. . . .
>
> As of December 27, 2008, the Company hired an
> independent third party valuation firm to estimate the
> fair value of these securities using a discounted cash
> flow analysis and an assessment of secondary markets.
> Based on this estimation and other factors, the
> Company concluded that an other-than-temporary
> impairment loss had occurred. The primary driver of
> this conclusion was the magnitude of the calculated
> impairment and the diminished credit ratings of the
> companies underwriting these securities. Accordingly,
> the Company recorded an other-than-temporary
> impairment loss of $15,104[,000] within other expense
> in its condensed consolidated statement of income for
> the second quarter of fiscal 2009.

The Form 10-Q contained certifications by Papa and Brown.

In a February 3, 2009 conference call with analysts concerning the fiscal

2009 second quarter results, defendant Brown identified the ARS writeoff as the

"most material item" affecting those results:

> Starting with the most material item this quarter
> we incurred a charge of $15 million or $0.16 per share
> related to the write-down of auction rate securities
> purchased in Israel from Lehman Brothers. These
> assets were written down from a face value of $18
> million and continue to be held as noncurrent assets.

The writedown and disclosure of the Lehman connection substantially

contributed to a drop in Perrigo's stock of more than $6 per share on February 3,

2009, a one-day decline of 21.1%.   This dramatic drop is in stark contrast to two

indices that Perrigo is included in, which actually had gains the same day. Specifically, S&P 400 Health Care Index and the Nasdaq Biotech Index gained 0.5% and 1.8%, respectively, on February 3, 2009.

The complaint alleges that, as a result, Class members, who had purchased Perrigo stock during the Class Period, were damaged.

### The Motion

Defendants now move to dismiss the complaint in its entirety and with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted.

### Discussion

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqal, 129 S. Ct. 1937, 1949-50 (2009).

In deciding such a motion, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

First Cause of Action: Violation of Section 10(b)

Plaintiffs assert § 10(b) and Rule 10b-5 violations against corporate defendant Perrigo and the officer defendants Papa and Brown.

-12-

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of the rules set forth by the Securities and Exchange Commission.   15 U.S.C. § 78j.

SEC Rule 10b-5, promulgated thereunder, makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court has articulated the elements necessary to sustain a private cause of action for securities fraud under § 10(b) and Rule 10b-5:

> In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

The Private Securities Litigation Reform Act ("PSLRA") provides that, where misleading statements or omissions under § 10(b) are alleged, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1). Here, defendants challenge the sufficiency of plaintiffs' pleadings with respect to (1) misrepresentations or omissions by defendants; (2) the materiality of such alleged misrepresentations or omissions; (3) scienter on the part of defendants; and (4) loss causation.

A. <u>Misrepresentations and Omissions</u>

Defendants argue that the Amended Complaint fails to plead facts demonstrating that the valuation of the ARS recorded in Perrigo's November 6, 2008 10-Q was materially false.   Defendants cite to <u>In re Loral Space & Communications Ltd. Securities Litigation</u>, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004), to support their contention that a "threadbare assertion" that a writedown should have been recorded in an earlier quarter is insufficient to plead a federal securities fraud claim.

However, plaintiffs' Amended Complaint is no "threadbare assertion" that the writedown should have been recorded earlier.   Plaintiffs argue persuasively that the identical factors that caused Perrigo to drastically writedown the value of the ARS on February 3, 2009—increased credit and liquidity risks—were

operative and evident to defendants at the time they issued the November 6, 2008 statements.

ARS generally had faced liquidity problems since the investment banks, which had underwritten the ARS and managed the auctions, stopped supporting the auctions in January and February 2008.   The liquidity problems of the Lehman-associated ARS were aggravated, to say the least, by Lehman's September 15, 2008 bankruptcy, since Lehman was not only the underwriter, but the market maker of these securities.   With its bankruptcy, there was no longer any possibility that Lehman would revive the auction markets for these ARS, nor redeem ARS underwritten by them, as Citigroup, Merrill Lynch, and UBS had done earlier.

Plaintiffs have asserted a factual basis for alleging that the statements about value in the November 6, 2008 press release and the contemporaneous SEC filings were false and misleading.

Plaintiffs also allege that it was highly misleading to omit any reference to Lehman's connection to the ARS dealings now that Lehman was in bankruptcy. This is an allegation of substance in the § 10(b) and Rule 10b-5 context.

B. Materiality

Defendants argue that, even if there were misstatements or omissions, the Amended Complaint fails to establish that any such misstatements or omissions were material.

Defendants argue that, in fact, the entirety of Perrigo's ARS investment was immaterial to Perrigo as a company, noting that the entire $18 million face value in ARS held by Perrigo was less than 1% of its $2.6 billion in total assets in fiscal year 2008, and such investments were completely unrelated to Perrigo's business lines.   Defendants further note that the 25% to 33% writedown that plaintiffs claim Perrigo should have recorded at the beginning of the Class Period amounted to only about one-quarter of one percent of Perrigo's total revenue of $1.8 billion in fiscal year 2008.

Plaintiffs argue that defendants ignore the impact of the writedown on net earnings.   According to the Amended Complaint in 1Q09, Perrigo should have charged against earnings an additional 25% to 33% impairment that occurred in that quarter.   Plaintiffs also allege in the Amended Complaint that Perrigo reported materially inflated income and assets.   Plaintiffs argue that the prior temporary charge taken in 3Q08 of $3.4 million should have been reclassified as permanent and charged against operating earnings.   Plaintiffs claim that if Perrigo had done so, its net income would have been 21% to 25% lower than reported, and would have dropped 16% from the prior comparable quarter, rather than increased by 12%.   That this is a material difference goes without saying.

C. Scienter

The Supreme Court has held that a plaintiff asserting a securities fraud claim "must state with particularity facts giving rise to a strong inference" of

scienter, which is a "mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 319 (2007).

The Second Circuit has held that the requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

Defendants argue that the Amended Complaint fails to allege facts supporting a "strong inference" of scienter, because: (1) there is no allegation of a motive or opportunity to commit fraud; and (2) there are no facts pleaded showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," which is required to adequately plead strong circumstantial evidence of conscious misbehavior or recklessness. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000)).

It is sufficient to say that plaintiffs have pleaded facts (presumed true for purposes of this motion) which strongly indicate that defendants Perrigo, Papa and Brown, must have known in November 2008 of the severe danger to the value of the ARS. There is sufficient pleading of scienter also then.

D. Loss Causation

Defendants argue that the Amended Complaint fails to sufficiently allege

loss causation, noting that the Second Circuit has required a plaintiff claiming a

§ 10(b) violation to allege that the defendant's misrepresentation caused the

plaintiff to incur a loss and that this loss was not caused by business reversals or

other factors.   Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)

(finding that, to plead loss causation, a plaintiff must allege: "(i) facts sufficient to

support an inference that it was defendant's fraud—rather than other salient

factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to

apportion the losses between the disclosed and concealed portions of the risk

that ultimately destroyed an investment").

   In the Amended Complaint, plaintiffs allege that the "writedown and

disclosure of the Lehman connection substantially contributed to a drop in

Perrigo's stock of more than $6 per share on February 3, 2009."   Defendants

argue that this allegation is insufficient to withstand the motion to dismiss

because it does not take into account that on that same day, Perrigo also

announced other unfavorable circumstances that may not have been related to

the ARS problem.

   However, a plaintiff need only allege, and prove, that a fraud-related

disclosure was a "*substantial* cause" of the decline, not the *sole* cause.   In re

Vivendi Universal, S.A., Sec. Litig., 605 F. Supp. 2d 586, 599 (S.D.N.Y. 2009).

That is precisely what plaintiffs have alleged here.

   Plaintiffs have made sufficient allegations regarding loss causation to

survive a motion to dismiss.

-18-

Second Cause of Action: Violation of Section 20(a)

In addition to direct claims of fraud, plaintiffs have asserted that the individual defendants, i.e., Papa, Brown, Brlas, Kunkle, and Zilberfarb, are liable for Perrigo's alleged § 10(b) and Rule 10b-5 violations as controlling persons under § 20(a) of the 1934 Act.   Although Papa and Brown cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage.   Police & Fire Ret. Sys. v. SafeNet, Inc., 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009).   Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).   To establish a prima facie case of control person liability in the Second Circuit, a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108 (citing S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

The control person claims are premised on the primary violations of § 10(b) and Rule 10b-5 by Perrigo.   These primary liability claims are sufficient to

survive a motion to dismiss.   The § 20(a) claims have the requisite primary violation foundation.

Defendants do not challenge the preposition that plaintiffs have sufficiently pled the second element of a prima facie claim, that the individual defendants possessed control over the primary violator.   Thus, the sufficiency of this claim turns on the question of the individual defendants' culpable participation.

In First Jersey, the Second Circuit held that a prima facie case of liability under § 20(a) requires a plaintiff to show that "the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."   101 F.3d at 1472.   This "culpable participant" requirement was recently reiterated in ATSI, 493 F.3d at 108.   Thus, it would appear to be correct to find that "culpable participation" is a pleading requirement to state a § 20(a) claim.   Further, such participation must be pled with particularity.   Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006).   To withstand a motion to dismiss, a § 20(a) claim must allege particularized facts of the controlling person's conscious misbehavior or recklessness.   Id. at 248.

Plaintiffs have surely alleged sufficient facts to the effect that Papa and Brown were culpable participants in the alleged fraud of Perrigo.   As to the other individual defendants (Brlas, Kunkle, and Zilberfarb), the Amended Complaint (par. 90) simply "lumps" them together with Papa and Brown in a general allegation applicable to all the individual defendants.

> Throughout the Class Period, the Individual Defendants had the power and authority and exercised the same to cause Perrigo to engage in the wrongful acts complained of herein.   By virtue of their positions as Chairman, President, CEO, CFO, members of the Audit Committee, the Individual Defendants were able to, and did, control the contents of the quarterly report and press release which Perrigo disseminated in the marketplace during the Class Period concerning Perrigo's investments and financial results.   Each of the Individual Defendants exercised control over the general operations of Perrigo and/or its reporting of financial results and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and other members of the Class complain.

There is no differentiation as to what Papa and Brown did versus what the other individual defendants did.   Other parts of the Amended Complaint contain sufficient allegations regarding Papa and Brown to show their culpable participation.   But there are no sufficient allegations as to Brlas, Kunkle, and Zilberfarb in other parts of the Amended Complaint.   In paragraph 90 itself, there are no particularized facts alleged as to these three defendants regarding what they actually did to constitute culpable participation.

Therefore, the court rules that the § 20(a) claim against Papa and Brown can stand, but such claim must be dismissed as to Brlas, Kunkle, and Zilberfarb.

### **Conclusion**

Defendants 12(b)(6) motion to dismiss is granted with respect to the § 20(a) claim against defendants Brlas, Kunkle, and Zilberfarb.

The motion is denied with respect to all other claims.

-21-

This opinion resolves the motion listed as document number 28 in this case.

SO ORDERED.

Dated:   New York, New York
         October 7, 2010

Thomas P. Griesa
U.S.D.J.